U.S. DISTRICT COURT
DISTRICT OF MAINE
2005 SEP 29 A 10: 02

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

DEPUTY CLERK
RECEIVED
OCT 03 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ARTHUR D'AMARIO, III, | ) | |
| | ) | |
| Plaintiff *pro se*, | ) | |
| | ) | D.R.I. Civil No. 04-CV-164 |
| v. | ) | D.Me. Civil No. 04-232-P-H |
| | ) | |
| BARRY J. WEINER, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON MOTION TO DISMISS**

Barry J. Weiner, United States probation officer, has filed a motion to dismiss[1], or in the alternative for summary judgment (Docket No. 23), in this civil rights Bivens action for compensatory and punitive damages. Arthur D'Amario, III, a convicted federal defendant in Rhode Island, has sued the chief of the United States Probation Office in Rhode Island claiming numerous constitutional deprivations. A long and convoluted procedural history brings the case to the District of Maine. After reviewing the pleadings and extra-pleading materials submitted by both parties, I now recommend that the court grant the defendant's motion.

[1] Weiner's motion also seeks dismissal under Rule 12(b)(5), insufficiency of service of process. The Assistant United States Attorney representing the defendant correctly points out that D'Amario has not yet served the Attorney General or the United States Attorney for the district in which this action commenced, thus failing to comply with Rule 4(i)(1)(B). However, given the convoluted history of this case, if I were to proceed in strict compliance with Rule 4, in all fairness I would have to allow D'Amario a brief additional period to complete service. I see no point in proceeding down that road because at this juncture I am satisfied that the matter can be dismissed in its entirety for other unrelated reasons.

## Nature of the Case

### A. The Operative Complaint

Prior to August 11, 2005, the operative complaint in this case was the original complaint filed in the United States District Court in Arizona. (Docket No. 1, Elec. Attach. 18; see also Order re. Pl.'s Mot. to Strike, Docket No. 10.) On August 11, 2005, in conjunction with his response to Weiner's motion to dismiss, D'Amario filed an Amended Verified Complaint (Docket No. 28) citing Rule 15(a) of the Federal Rules of Civil Procedure and McDonald v. Hall, 610 F.2d 16 (1st Cir. 1979), for the proposition that Weiner's pending motion to dismiss did not defeat his right to amend his pleading once as a matter of course at any time before a responsive pleading is filed.[2] Although the proposed amended verified complaint contains some additional allegations and different formatting, I will treat it as the operative pleading for purposes of my recommended decision on the motion to dismiss.

### B. The Factual Allegations

Arthur D'Amario, III, a resident of Rhode Island, alleges that he suffered constitutional deprivations while he was serving a sentence of supervised release in Arizona after completing a period of imprisonment imposed in connection with a Rhode Island federal conviction. (Amended Verified Complaint ¶ 2.) Barry J. Weiner is the chief United States Probation Officer for the District of Rhode Island. (Id. ¶ 3). According to D'Amario, Weiner engaged in the following acts in a malicious effort to harm him. At the time of D'Amario's release from prison in August 2002, Weiner

---

[2] There are both factual and legal problems connected with this citation to authority. McDonald cannot be fairly cited for the claimed proposition. Reliance upon Rule 15(a) ignores the fact that the Amended Verified Complaint is at least the third pleading in this case based upon my review of the Arizona docket.

secretly conferred with Brian Henry, D'Amario's Bureau of Prisons case manager. (Id. ¶¶ 5, 6). The purpose of these secret communications between Weiner and Henry was to get Henry to trick D'Amario into signing a release plan whereby D'Amario would serve his community confinement in Arizona and then, on April 29, 2003, return to Rhode Island to serve his supervised release. After succeeding in this exploit, Henry thereupon destroyed all evidence of an original release plan that would have allowed D'Amario to do both his community confinement and supervised release in Rhode Island, thereby creating the illusion that D'Amario actually wanted to reside in Arizona. (Id. ¶ 6.)

When D'Amario eventually arrived in Arizona, Weiner caused his agents to threaten D'Amario to never return to Rhode Island or enter any probation office, under penalty of arrest. (Id. ¶ 7). Weiner took this action, in part, because "Judge Lagueux of Rhode Island" asked him to devise ways to "banish" D'Amario, keep him incarcerated and harass him in the course of supervision. (Id. ¶ 8). On April 29, 2003, the day D'Amario was released from custody by the Bureau of Prisons, Weiner assigned[3] United States Probation Officer Tom Galindo to issue a warning that D'Amario was not to return to Rhode Island. (Id. ¶ 10). Thereafter, a federal judge ordered D'Amario to submit in writing to Weiner his reasons for requesting that his supervised release be transferred to Rhode Island. (Id. ¶ 11). D'Amario complied with this directive, but when Weiner received the letter he destroyed it and then lied by telling others that D'Amario had ignored the judge's directive. (Id. ¶ 13).

---

[3] In its recitation of the "underlying criminal cases," the Government asserts that D'Amario's underlying conviction arose from a firearm charge indicted in Rhode Island, that the case was transferred to New Hampshire for trial, and that supervision of D'Amario post-sentencing was transferred back to Rhode Island. According to the Government, while D'Amario was serving a term of incarceration in New Jersey, he sent a threatening missive in regards to United States District Judge DiClerico, who presided at the New Hampshire trial, and was convicted for violating 18 U.S.C. § 115(a)(1)(B).

As a consequence of Weiner's acts, D'Amario was forced to reside with his parents in the desert of Arizona between April 29 and June 1, 2003. (Id. ¶ 14.) Due to this living arrangement D'Amario endured a number of what he describes as "extreme hardships," listing some seventeen different deprivations such as being forced to live in a retirement community although he was only 50 years old, being denied the opportunity to play hockey with his Rhode Island summer league and having no access to transportation, which prevented him from obtaining needed medical care. (Id. ¶ 14(a-q).) D'Amario also relates that these problems could not be addressed because in early May 2003 "all officers shut him out and stopped talking to him." (Id. ¶ 14(q).) While D'Amario was stranded in Arizona, his sister-in-law accessed his Rhode Island bank account and absconded with $15,000.00 in social security benefits, at least one-third of which was his. (Id. ¶¶ 15, 16).

Beginning in April 2003 Weiner wrote a series of letters and memos to third parties in the course of an untrue "smear campaign" against D'Amario, telling Galindo and AFPD[4] Lori Koch that D'Amario is "a violent, dangerous, unstable, hallucinatory 'paranoid-schizophrenic.'" (Id. ¶ 17). Weiner also circulated disinformation to the effect that D'Amario's brother, a resident of Rhode Island, feared D'Amario and did not want him to return to Rhode Island. (Id. ¶ 18.) Weiner also prevented D'Amario from returning to Rhode Island in the spring of 2003 to claim certain Section 8 housing he had become eligible to receive, knowing that D'Amario had to travel to Rhode Island to acquire the housing. (Id. ¶ 19).

---

[4] I am not familiar with the AFPD acronym. I assume Ms. Koch is or was an Arizona Federal Public Defender.

According to D'Amario, by June 2003 the situation at his parents' residence became so unbearable that D'Amario was forced to deliberately violate his supervised release in order to be returned to prison where he could be with people of his own age. (Id. ¶ 20).

On November 12, 2004, D'Amario was again discharged to supervised release in Arizona where he remained until March 31, 2005, suffering more extreme hardships, except that he had transportation. According to D'Amario, he once again lost an opportunity to secure affordable Section 8 housing for which he allegedly had to appear in person in Rhode Island "to accept," on or before April 5, 2005, because Weiner refused to allow any probation officer to issue him a travel pass. (Id. ¶¶ 21-24.) Additional hardships were endured by virtue of D'Amario's default in two civil cases in Rhode Island because he could not appear in court. (Id. ¶ 24). In 2004, Weiner again used his influence while D'Amario was imprisoned to cause him to be locked up in administrative segregation "for no valid reason." (Id. ¶ 29).

In 2003 D'Amario submitted a notice of his claim to the Administrative Office of the United States Courts, asserting the facts set forth above. (Id. ¶ 32). According to D'Amario, the Administrative Office informed him that there was no administrative process available for these claims. (Id. ¶ 33).

As cause for this action, D'Amario points to the First Amendment's Free Speech Clause, the Eighth Amendment's prohibition on cruel and unusual punishment, equal protection precepts, his substantive right to liberty, and also alleges tort theories based on Weiner's alleged violation of statutory duties to facilitate D'Amario's transition back to his community, "defamation rising to the level of a constitutional tort," false

imprisonment and intentional infliction of emotional distress *via* "outrageous, wanton and oppressive" conduct. (Id. ¶ 28.) The first amendment/equal protection theory is premised on an assertion that Weiner singled him out for this treatment because of his status as a "political prisoner." (Id. ¶ 26.) D'Amario asserts that he attained this status when he exercised his constitutional right to protest the conduct of the Rhode Island state police who "framed" him in 1999. (Id. ¶ 27.)

In his prayer for relief D'Amario seeks both compensatory and punitive damages from Weiner. For special damages, D'Amario seeks to recover for his "skyrocketed" non-Section 8 housing costs and for his lost disability benefits and stolen bank funds. (Id. ¶¶ 29, 30). With respect to the special damages, D'Amario asserts that Weiner at all times had the authority to allow D'Amario to return to Rhode Island to avoid these consequences. (Id. ¶ 34).

**C. The "Government's Version"**

In its motion to dismiss, at pages 1 through 7, the Government presents a background history of the underlying criminal cases against D'Amario, which affords significant insight into the nature of the civil claims D'Amario is now asserting against Weiner and which, in my view, strongly supports a finding in Weiner's favor on the Bivens claims vis-à-vis the qualified immunity defense. Although the Government's background recitation is merely a recitation of fact by the AUSA, D'Amario fails to controvert the recitation with regard to certain important matters of record although he does endeavor to controvert the recitation in other regards. Thus, the following additional facts appear to be conceded:

(1) Although D'Amario was not subject to a court order that restricted travel to Rhode Island between April 29, 2003, and June 2, 2003, (the five-week period that D'Amario characterizes as his first term of exile), he was subject to such a restriction in the subsequent term of supervised release that commenced September 20, 2003. (Mot. to Dismiss at 3.)

(2) D'Amario was arrested in New Jersey on June 2, 2003 for violating the conditions of his supervised release. (Id.)

(2) The supervised release that commenced September 20, 2003, had a 25-month term. (Id.)

## Discussion

Rule 12(b) of the Federal Rules of Civil Procedure authorizes a defendant in a civil action to present certain claim-dispositive defenses by motion, prior to submitting an answer to a plaintiff's complaint. Fed. R. Civ. P. 12(b). Among the defenses that may be asserted in such a motion are the defenses that the court "lack[s] jurisdiction over the subject matter" and that the plaintiff's complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(1) & 12(b)(6). Ordinarily, when Rule 12 defenses are raised, the Court will look exclusively at the allegations set forth in the plaintiff's complaint to determine whether the claim or claims at issue may proceed. An exception to this limitation is recognized for 12(b)(6) defenses when the parties submit matters outside the pleadings for the court to consider in connection with the motion. Fed. R. Civ. P. 12(b). In addition, when a defendant moves to dismiss a claim based on a lack of subject matter jurisdiction, the defendant may support the motion with affidavits and other materials and the plaintiff must meet the burden of proving that jurisdiction exists,

typically by submitting additional, extra-pleading materials. 5A C. Wright & A. Miller, Federal Practice and Procedure, § 1350 at 213 (2d ed. 1990).

With regard to Rule 12(b)(6), the First Circuit has recently held, in light of Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 (2002), that in order to survive a motion to dismiss for failure to state a claim against a state actor under 42 U.S.C. § 1983, a complaint:

> need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). State of mind, including motive and intent, may be averred generally. Cf. Fed. R. Civ. P. 9(b) (reiterating the usual rule that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally"). In civil rights actions, as in the mine-run of other cases for which no statute or Federal Rule of Civil Procedure provides for different treatment, a court confronted with a Rule 12(b)(6) motion "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 66 (1st Cir. 2004). Presumably the same pleading standard would apply to a civil rights action against a federal officer brought pursuant to Bivens v. Six Unknown FBI Agents, 403 U.S. 388 (1971). The standard for evaluating whether the allegations of a complaint state a claim for which relief may be granted is ordinarily exacting: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," Conley v. Gibson, 355 U.S. 41, 46 (1957), and the court must assume that all well-pleaded allegations are true and indulge all reasonable inferences from these allegations in the complainant's favor. Id. However, the court may depart from this standard when the

parties introduce matters outside the pleadings and the plaintiff fails to argue against conversion in a submission that substantially complies with Rule 56(f). Rule 12(b); Vargas-Ruiz v. Golden Arch Dev., Inc., 368 F.3d 1, 3-4 & n.2 (1st Cir. 2004). D'Amario has invited conversion of the Government's motion into a motion for summary judgment by submitting a declaration and a letter exhibit in support of the substantive merits of his claims and by disregarding entirely the Rule 56(f) anodyne. When a motion to dismiss is converted to a motion for summary judgment the moving party is entitled to judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts (as opposed to the allegations), without resort to speculation. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). If the facts and inferences can support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and

summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

**A. The Constitutional Claims**

The Government argues that D'Amario has failed to state a constitutional claim. D'Amario's constitutional claims appear to be based on the following theory: Weiner had the discretionary authority[5] to control whether D'Amario could visit the State of Rhode Island; Weiner exercised his authority to, in effect, make banishment from Rhode Island a condition of D'Amario's release. By virtue of this *de facto* banishment, D'Amario suffered various consequential deprivations or damages to property or interests located in Rhode Island and also suffered the "extreme hardship" of living in his parents' home in a retirement community in the desert.

According to D'Amario, Weiner forced him into exile in the desert in retaliation for first amendment activity. According to D'Amario he has been "protesting" that he was "set up and framed by R.I. State Police" for the 1999 indictment that resulted in the term of supervised release from which this action arises. Whether or not there is any substance to the first amendment retaliation theory, it appears to be established law that banishment constitutes an unconstitutional infringement of liberty unless it is imposed by a court based on findings related to the defendant's special circumstances, such as a need to exclude the defendant from a location that is inimical to his rehabilitation or to protect individuals in that location from possible predation by the defendant. Even when a court imposes a territorial restriction as a condition of release based on such findings, the Constitution may well impose an outer limit on the scope of any such restriction. See,

[5] In its recitation of the "underlying criminal cases," the Government asserts that Weiner is the Chief of the Rhode Island District of the U.S. Probation Office and that responsibility for supervision over D'Amario was transferred to Weiner's district, but that Weiner was never D'Amario's probation officer.

e.g., United States v. Sicher, 239 F.3d 289 (3d Cir. 2000) (collecting cases). Of central significance to D'Amario's claim is the allegation that he was banished pursuant to an exercise of discretion by Weiner prior to or in the absence of any pre-deprivation hearing. Cf. Bagley v. Harvey, 718 F.2d 921, 925 (9th Cir. 1983) (affirming denial of habeas corpus writ pursued against parole commission's imposition of a ban on travel to defendant's home state during period of parole, except for child visitation and court proceedings, observing: "Bagley could have been constitutionally excluded from Washington during the entire term of his sentence by being required to serve a full prison term in another state. Since parole in a foreign state is clearly less punitive than imprisonment in a foreign state, it cannot be deemed unconstitutional. [I]t is not cruel and unusual punishment to require Bagley to serve his parole term in Iowa."); Olim v. Wakinekona, 461 U.S. 238, 247-48 (1983) (holding that an interstate *prison* transfer, "in and of itself," does not infringe upon any liberty interest protected by the Due Process Clause) (emphasis added).

Essentially, the crux of D'Amario's suit is that Weiner was instrumental in imposing *de facto*[6] banishment as a condition of supervised release, in violation of due process (i.e., without first petitioning the court to modify the terms of release) and in deprivation of, presumably, his "liberty" interest. The complaint that Weiner moved to dismiss provided sufficient notice to Weiner of the banishment claim for Rule 8 purposes, and Weiner has not challenged that theory on substantive grounds. I cannot find, based

---

6 In its recitation of the "underlying criminal cases," the Government asserts that in September 2003, United States District Judge Wiliam E. Smith of the District of Rhode Island imposed upon D'Amario a sentence that included, as a condition of supervised release, that D'Amario not travel to Rhode Island without prior approval of the probation office *and* the court. That statement is not supported by citation to material of evidentiary quality, although D'Amario has not contested it. Ideally, the Government might seek to supplement its motion so that this court might take judicial notice of certified copies of orders or factual findings entered on the docket in the District of Rhode Island that are not readily available here in the District of Maine.

on my review of authorities, that the imposition of *de facto* banishment by a probation officer, without having first afforded a probationer with meaningful judicial process, does not violate the Due Process Clause. Cf. United States v. Ju Toy, 198 U.S. 253, 273 (Brewer, J., dissenting) ("'[U]ndoubtedly where life and liberty are involved, due process requires that there be a regular course of judicial proceedings[.] .... [B]anishment is a punishment and of the severest sort."). Accordingly, I refrain from basing my recommendation on a legal finding that D'Amario's core banishment theory fails to state a constitutional claim.

However, a couple aspects of D'Amario's complaint clearly do not state claims for which relief may be granted. First, the alleged frustration of D'Amario's medical treatment appears to flow from his lack of access to a motor vehicle rather than official misconduct and, regardless, D'Amario clearly fails to allege or support with sworn testimony the existence of a "serious medical need" or an "excessive risk" to his health or safety, let alone any knowledge of, or deliberate indifference to, such a condition on Weiner's part. Farmer v. Brennan, 511 U.S. 825, 837 (1994); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). D'Amario's complaint fails to state an Eighth Amendment claim for injury arising from deliberate indifference to a serious medical need. In addition, D'Amario's allegation about Weiner's influence over the imposition of administrative segregation by the Bureau of Prisons in 2004 is specious. Weiner lacks the authority to control the conditions of D'Amario's confinement in prison. The "constitutional defamation" claim is also flawed because damage arising from injury to a plaintiff's reputation is not recoverable in a Bivens action. Siegert v. Gilley, 500 U.S. 226, 233-34 (1991); Davric Me. Corp. v. United States Postal Serv., 238 F.3d 58, 68-69 (1st 2001).

Furthermore, the alleged "smear campaign" involved only communications with a federal public defender and another probation officer, neither of whom had greater authority than Weiner allegedly had to control the terms and conditions of D'Amario's supervised release. Thus, the liberty and property deprivations that D'Amario complains of cannot be said to flow from defamatory statements made to either of these individuals, but only, if at all, from Weiner's alleged exercise of decision-making authority over D'Amario's requests to transfer or travel to Rhode Island (the banishment theory).

**B. Qualified Immunity**

Weiner claims that he is entitled to qualified immunity. I have concluded that the banishment theory sketches out a claim for deprivation of a liberty interest in the absence of procedural due process. However, the fact that the complaint may state a claim does not end the inquiry. Per the First Circuit Court of Appeals' instructions:

> [T]his circuit usually evaluates qualified immunity claims under a three-part test. See, e.g., Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60-61 (1st Cir. 2004). The first part of the test asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 61 (internal quotation marks omitted). In the second stage, the question is "whether the right was clearly established at the time of the alleged violation such that a reasonable officer would be on notice that his conduct was unlawful." Id. (internal quotation marks and alteration omitted). And in the last stage, we ask "whether a reasonable officer, similarly situated, would understand that the challenged conduct violated the clearly established right at issue." Id. (internal quotation marks omitted).

Torres-Rivera v. Calderon-Serra, 412 F.3d 205, 214 (1st Cir. 2005). The defense of qualified immunity is meant to protect government officials from "unnecessary and burdensome discovery or trial proceedings" and its applicability should be determined at the earliest possible juncture. Crawford-El v. Britton, 523 U.S. 574, 590, 597-98 (1998). The legal standard is designed to focus a court's attention on "the objective legal

reasonableness of an official's acts," Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982), in order to prevent "allegations of [unlawful] subjective motivation . . . to shield baseless lawsuits," Crawford-El, 523 U.S. at 590.

The Government has not specifically addressed the banishment claim in its discussion of qualified immunity. Nevertheless, it appears to me that Weiner is entitled to qualified immunity from D'Amario's banishment claim. With respect to the five-week "banishment" in 2003, it was D'Amario's choice to violate the conditions of his release after only five weeks. Although D'Amario might be able to present some set of facts consistent with the allegations set forth in his complaint that is capable of supporting a finding that Weiner deliberately disregarded or undermined his travel requests in retaliation for protected speech, thereby violating first amendment and/or due process precepts, a reasonable probation officer similarly situated to Weiner would not understand that denial or inaction on D'Amario's request(s) over a five-week period would give rise to a constitutional deprivation because the grounds asserted by D'Amario in support of his request(s) were merely the various inconveniences of living in his parents' desert home among retirees, none of which inconveniences comes close to the level of a constitutional deprivation. Additionally, the five-week deprivation alleged was simply not of sufficient duration for a reasonable probation officer to believe that D'Amario had been effectively "banished" or subjected to an "objectively unreasonable" deprivation.

As for the banishment alleged for the longer period between November 12, 2004, and March 31, 2005, it appears that that period of supervised release arose from a court order restricting D'Amario's liberty to return to Rhode Island without prior court

approval. Because this period of "banishment" did not flow from an exercise of final discretionary authority by Weiner, Weiner is immune from liability on this claim. Furthermore, even if Weiner had unfettered discretion to issue a "travel pass" in regard to D'Amario's quest for Section 8 housing located in Rhode Island, a reasonable probation officer would not consider it a constitutional violation to deny D'Amario's request at a time when D'Amario still had another 20 or 21 months left to serve in Arizona and was restricted from entering Rhode Island during that timeframe.

**C. The Federal Tort Claims Act**

The United States Attorney for the District of Maine has submitted a certification that the defendant's alleged actions were all performed in the scope of his federal office and that, therefore, the United States must be substituted as the party defendant with regard to D'Amario's common law tort claims. (Mot. to Dismiss at 12; Scope Cert. of USA Paula Silsby, Docket No. 23, Elec. Attach. 3.) As the Government asserts, D'Amario's tort claims fall under the Federal Tort Claims Act ("FTCA") because D'Amario claims that Weiner, an employee of the United States Probation Office, violated certain state law tort duties in the course of supervising D'Amario's release. See 28 U.S.C. § 2679(b), (d). Accordingly, the United States is to be substituted for Weiner as the party defendant in regard to the tort claims and Weiner is to be dismissed from the action, assuming that the Court agrees with the foregoing recommendation on the Bivens claims. Id.

The Government next argues that D'Amario's tort claims must be dismissed altogether because D'Amario failed to preserve them through the administrative process. (Mot. to Dismiss at 13.) A basic prerequisite to preserving a claim against the United

States is that a claimant first present his claim to the appropriate federal agency for administrative review. 28 U.S.C. § 2675. There is a two-year limitation period for fulfilling this requirement. 28 U.S.C. § 2401(b). The Government has submitted a declaration from the Administrative Office of the United States Courts (the "AO") to the effect that D'Amario never submitted a claim to the AO, which has administrative oversight of federal probation officers. (Decl. of John Chastain, Docket No. 23, Elec. Attach. 3.) D'Amario has submitted a verified amended complaint in opposition to the motion in which he swears, under penalty of perjury, that on or about early 2004, the AO "wrote . . . to say that it had no administrative remedy process for these kinds of claims against a Probation Officer." (Ver. Am. Compl. ¶ 33.) He also submitted a declaration in which he asserts that he "submitted a Notice of Administrative Claim to the Administrative Office of the U.S. Courts regarding Defendant's conduct in late 2003." (Pl.'s Decl. ¶ 1, Docket No. 27.) D'Amario also relates in his declaration that he cannot presently produce a copy of the AO's responsive letter because it is at his parents' house in Arizona (D'Amario is currently incarcerated elsewhere) and he cannot direct his mother to it because his father "moved all of his files around." (Id.) This showing is inadequate to surmount the jurisdictional bar that arises in regard to the failure to exhaust administrative remedies. In order to satisfy the requirements of § 2675, D'Amario must demonstrate that the language of his administrative claim "serve[d] due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought." Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 40 (1st Cir. 2000). The specific concern in this case is that D'Amario's evolving complaint may well have come to exceed the scope of whatever

administrative claim he presented, assuming he did, in fact, present one. Id. D'Amario's existing asseverations do not permit the Court to determine whether he presented the Administrative Office of the Courts with a "false imprisonment" claim or with an "intentional infliction of emotional distress claim." He asserts only that he reported Weiner's alleged "conduct." This is problematic because, even if D'Amario did send a notice of claim to the AO, if he complained only of banishment and defamation, it would have been appropriate for the AO to decline to review those claims administratively because neither fall within the purview of the FTCA: the Bivens claim alleges a constitutional deprivation, not a state law tort claim, and the defamation claim is not actionable because the United States has not waived sovereign immunity with regard to state law defamation claims. Thus, the precise content of D'Amario's notice is material to the jurisdictional question. Because D'Amario fails to carry his burden of proof on the jurisdictional question, I recommend that the Court dismiss the state law tort claims against the United States, as the party substituted for Weiner.

Even if D'Amario's showing regarding his notice of claim were sufficient to forestall judgment at this point in the proceedings, D'Amario's state law defamation claim is barred by an exception to the FTCA's limited waiver of sovereign immunity. See 28 U.S.C. § 2680(h). The FTCA does not permit suits against the United States for defamation. Id. Accordingly, there is no jurisdiction over this claim.

The false imprisonment claim is not foreclosed by the FTCA. Id. Thus, if D'Amario has preserved these claims administratively, they would only be subject to dismissal for failure to state a claim. In order to evaluate the substantive merits of these claims, the Court must look to the "'law of the place' where the alleged wrongful actions

occurred." Rucci v. United States INS, 405 F.3d 45, 49 (1st Cir. 2005). Because D'Amario presumably would have performed all of the alleged actions from his District of Rhode Island office, I look to Rhode Island law. I agree with the Government that it is not false imprisonment for a probation officer to deny a discretionary travel pass or transfer to a federal convict serving a term of supervised release. The tort of false imprisonment requires unlawful confinement; "[t]he action . . . is derived from the ancient common-law action of trespass and protects the personal interest of freedom from restraint of movement." Moody v. McElroy, 513 A.2d 5, 7 (R.I. 1986). The circumstances of this case do not present intentional "confinement" or "restraint of movement" within the meaning of the false imprisonment tort. As a matter of law, the facts alleged by D'Amario present a case of "exclusion," the opposite of "confinement." See, generally, Restatement (Second) Torts §§ 35(1)(a), 36 cmt. b, cmt. h & illus. 8; Martin v. Lincoln Park West Corp., 219 F.2d 622, 624 (7th Cir. 1955) (observing that tort of false imprisonment requires "restraint of an individual's personal liberty of freedom of locomotion" and affirming dismissal of a claim based on the plaintiff being locked out of a room in which he had resided). D'Amario's freedom of locomotion was in no way circumscribed by Weiner. How else could D'Amario have had the liberty to violate his supervised release by traveling to New Jersey, not to mention his liberty to move about freely within the entire state of Arizona? As for the emotional distress claims, I assume that the Rhode Island Supreme Court would find that the relationship between a probation officer and a probationer would give rise to a duty to avoid inflicting emotional distress. See Norton v. McOsker, 407 F.3d 501, 509 (1st Cir. 2005). Thus, in order to state a claim D'Amario must satisfy the following four factors:

> (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.

Id. (quoting Champlin v. Washington Trust Co. of Westerly, 478 A.2d 985, 989 (R.I. 1984)). Extreme and outrageous conduct means conduct that a reasonable person would regard as "atrocious and utterly intolerable in a civilized community." Id. at 510. In my view, it is not extreme and outrageous conduct to place a federal convict in his parents' home during a term of supervised release, to deny his request to relocate to the state of his choice or to otherwise prevent him from traveling across the country to fulfill his social agenda. Furthermore, under Rhode Island law a plaintiff cannot overcome a summary judgment motion against an intentional infliction of emotional distress claim without introducing evidence related to actual "physical symptomatology" arising from the alleged emotional distress. Unsupported conclusory assertions such as those contained in D'Amario's verified amended complaint would not suffice to evade summary judgment. Clift v. Narragansett TV L.P., 688 A.2d 805, 813 (R.I. 1996).

## Conclusion

For the reasons set forth herein, I **RECOMMEND** that the Court **GRANT** the motion to dismiss.

## NOTICE

> A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Margaret J. Kravchuk
U.S. Magistrate Judge

Dated September 29, 2005